IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CYNTHIA A. MORRIS, | : | CIVIL ACTION NO. **4:CV-06-1720** |
| | : | |
| Plaintiff | : | (Judge McClure) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

This is a Social Security disability case pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), wherein the Plaintiff, Cynthia A. Morris, is seeking review of the decision of the Commissioner of Social Security (Commissioner)[1] which denied her claim for disability insurance benefits (DIB) and supplemental security income benefits (SSI) pursuant to Titles II and XVI of the Social Security Act (Act), 42 U.S.C. §§ 401-433, 1381-1383f.

## I. PROCEDURAL HISTORY.

The Plaintiff protectively filed an application for DIB and SSI on June 29, 2004, alleging disability due to morbid obesity, degenerative arthritis of the knees, bipolar disorder, depression and sleep apnea, since June 16, 2004. (R. 41, 51, 54-55, 197). Her claim was denied initially. (R. 33-36, 201-05). The Plaintiff filed a timely request for a hearing (R. 37) and a hearing was held before an Administrative Law Judge (ALJ) on February 10, 2006. (R. 213-231). At the hearing, the Plaintiff, represented by counsel, and a vocational expert (VE) testified. (R. 213-231). The Plaintiff was denied benefits pursuant to the ALJ's decision of February 28, 2006. (R. 15-22).

The Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 14). Said request was denied on June 30, 2006 (R. 5-8), thereby making the ALJ's decision the "final decision" of the Commissioner. 42 U.S.C. § 405(g). That decision is the subject of

---

[1] We have substituted the present Social Security Commissioner, Michael J. Astrue, as the Defendant herein.

this appeal.

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.  (Docs. 10, 11, 14, 17).

## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).  It is less than a preponderance of the evidence but more than a mere scintilla.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III.  ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520 (2004).  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any

point in the sequence, review does not proceed any further.  20 C.F.R. §§ 404.1520, 416.920 (2004).

The first step of the process requires the Plaintiff to establish that she has not engaged in "substantial gainful activity." *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).  The second step involves an evaluation of whether the Plaintiff has a severe impairment.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). The Commissioner must then determine whether the Plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No.4.

If it is determined that the Plaintiff's impairment does not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the Plaintiff establishes that she is unable to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The Plaintiff bears the burden of demonstrating an inability to return to her past relevant work.  *Plummer*, 186 F.3d at 428. Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the Plaintiff is able to perform, consistent with her medically determinable impairments, functional limitations, age, education and work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  This is Step Five, and at this step, the Commissioner is to consider the Plaintiff's stated vocational factors.  *Id.*

The ALJ proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Social Security Act. (R. 18).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity since her alleged onset date.  (R. 19-20).  At step two, the ALJ concluded that Plaintiff has advanced degenerative changes of both knees consistent with chondromalacia, and morbid obesity.  (R. 19-20).  At step three, the ALJ concluded that these severe impairments are not severe enough, either singly or in combination, to meet or equal the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4.  (R. 19-21).  At step four, the ALJ found that Plaintiff is capable of performing her past relevant work, namely work as a sales clerk.  (R. 22).  Thus, review

3

need not proceed any further.  Accordingly, the ALJ found that the Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 22).  20 C.F.R. §§ 404.1520(f) and 416.920(f).

## IV.  BACKGROUND.

### A. Factual Background.

The Plaintiff, forty-four years old at the time of the ALJ's decision, was considered a younger individual under the Regulations.  (R. 51).  20 C.F.R. §§ 404.1563 and 416.965. She has a high school education and no further training.  (R. 60, 217).  Plaintiff's past work experience includes work as a sales clerk and layaway associate in a retail store.  (R. 55, 227).  Plaintiff alleges disability since June 16, 2004.  She testified that she cannot work due to the soreness in her legs from degenerative disease and arthritis, morbid obesity and depression.  (R. 54-55).

Plaintiff testified that she last worked in 2003 at Wal-Mart.  (R. 217).  She also testified that she worked at Ollie's Bargain Outlet for one day.  She quit that job because of the pain in her leg.  (R. 217).  Plaintiff stated that she is scheduled to have surgery to reduce her weight.  (R. 218).  Plaintiff testified that she was treated by psychiatrists in the past. Plaintiff takes Effexor to treat her depression.  (R. 224).  The week before the ALJ hearing Plaintiff went to the Psychological Services Clinic for a psychological evaluation before the bypass surgery.  (R. 218-19).  The Clinic "passed" Plaintiff and indicated there was no reason why she could not to have the surgery.  (R. 219).  At the time of the ALJ hearing, Plaintiff reported that she weighed 410 pounds, down from 442 pounds.  Plaintiff had to lose an additional twelve pounds before her bypass surgery.  (R. 225).

Plaintiff testified that the only thing she had done for her knees was getting an MRI. (R. 219).  Plaintiff never had surgery on her knees.

Plaintiff testified that she is in constant pain with her legs, causing difficulty walking up and down steps.  Plaintiff reported that she does not use a cane or ambulatory device. (R. 71).  She stated that she just presses her arm against the wall to walk up steps.  (R. 220). Plaintiff indicated that she is able to climb stairs as many times as needed per day.  (R. 64).

4

The only medication Plaintiff takes is over-the-counter Advil or Tylenol. (R. 70, 220). She stated that she was never prescribed any prescription medication. (R. 221).

Plaintiff testified that she can sit for five or seven minutes before experiencing shooting pain in her leg. However, Plaintiff reported on her disability form that she has "no problem sitting for any amount of time" but experiences problems when she stands up. (R. 64). She stated that she is able to walk fifteen or twenty steps, and then has to stop in order to take weight off of her leg. When grocery shopping, Plaintiff has to lean on the cart to relieve the pain in her leg. She is able to load and unload the bags from the car and is able to carry four to five light bags or two heavy bags at once. (R. 63).

Plaintiff testified that she can stand for about five or ten minutes, and then must shift her weight to her right leg. She believes she can lift twenty-five to fifty pounds. (R. 220). The ALJ asked Plaintiff whether she could work an eight-hour day that permitted her to sit or stand whenever she wanted. Plaintiff replied, "Yeah, in pain, with pain, yes." (R. 221). Plaintiff later testified that she would likely fall asleep often during an eight-hour workday. (R. 223). At the ALJ hearing, Plaintiff rated her pain at an eight on a scale of zero to ten. (R. 221).

Plaintiff stated that she lives alone and takes care of her house. (R. 221). Plaintiff cooks and does the laundry. (R. 63-64). She cleans the house while sitting in a chair or takes frequent breaks while standing and cleaning. (R. 222). Plaintiff stated that she supports herself by being on welfare. (R. 226).

Plaintiff indicated that she is most comfortable when sitting on the couch in a slanted/reclining position. She does not sleep well and underwent a sleep apnea study. (R. 222-23). The study indications were loud snoring and restless sleep with excessive daytime hypersomnolence. (R. 186). During the study, Plaintiff stopped breathing fifty-five times in one hour. She reported that she is now down to seven episodes since she began wearing a breathing mask while sleeping. (R. 223). Plaintiff reported that because she does not sleep well at night, she falls asleep often during the day. (R. 223). She indicated that she falls asleep about six or seven times per day for fifteen to thirty minutes. (R. 223-24). However,

on Plaintiff's disability form she indicated that she only "occasionally" has problems sleeping. (R. 70).

Vocational expert, Kristan Sagliocco, testified that Plaintiff's past work as a sales clerk and layaway associate are lower level, semi-skilled jobs in the light duty exertional level.  (R. 227).  The ALJ asked the VE to hypothetically consider an individual of the same age, educational and vocational background as the Plaintiff.  The individual would be able to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for about six hours in an eight-hour workday, and be able to stoop occasionally.  (R. 227).  The VE stated that such an individual would be able to perform the Plaintiff's past relevant work, as well as the whole light duty range of work.  (R. 227-28).

The ALJ then asked the VE to consider that same hypothetical with the additional limitations of mild restrictions on the activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. The VE indicated that the individual would be able to perform the Plaintiff's past relevant work, as well as the whole light duty range of work.  (R. 228).

The ALJ then asked the VE to consider that same hypothetical with an individual who could lift twenty-five pounds occasionally, could stand or walk for one hour or less in an eight-hour workday, could sit throughout an eight-hour workday without limitation, is limited in pushing and pulling with the left leg, could never kneel, crouch, or climb, and who must avoid heights and moving machinery.  (R. 228).  The VE indicated that such an individual could perform work at the sedentary level.  Such positions would be a telephone solicitor, with 1,200 jobs available in the regional economy, and 25,000 jobs available in the state; an appointment setter, with 350 jobs available in the regional economy, and 5,000 jobs available in the state; an information clerk, with 1,600 jobs available in the regional economy, and 39,000 jobs available in the state; and a customer service position, with 5,400 positions available in the regional economy, and 78,000 jobs available in the state. (R. 229).

Finally, the ALJ asked the VE to consider that same hypothetical with an individual who could sit for no more than seven minutes, could stand for no more than ten minutes, could lift approximately twenty-five pounds, and even with a sit/stand option is unable to work an eight-hour day as a result of pain and sleepiness. (R. 229). The VE indicated that such an individual would not be able to find work in the national or regional economy. (R. 229).

The VE stated that if the hypothetical individual were required to recline while sitting, an individual employer could make such accommodations. The VE stated that although such arrangements could be made, they are not typically done in the economy. (R. 230).

### B. Medical Background.

On August 23, 2001, Plaintiff underwent an MRI of the thoracic spine. (R. 105). The MRI revealed mild degenerative changes. (R. 105).

In September 2002, Plaintiff began treating at All Seasons Treatment Center. (R. 106-116). Aimee Tsikitas was Plaintiff's social worker. On September 4, 2002, Ms. Tsikitas noted that Plaintiff's chief complaint was recurrent depressive symptoms and low self-esteem. (R. 114). Plaintiff reported that she was taking Prozac and Ativan. Ms. Tsikitas diagnosed major depressive disorder, current, severe without psychotic features, and assessed a Global Assessment of Functioning (GAF) score of 50.[2] (R. 116). In 2002, Plaintiff attended seven counseling sessions with Ms. Tsikitas.

Rommel N. Ramos, M.D., evaluated Plaintiff on October 9, 2002. (R. 112-13). Dr. Ramos noted that Plaintiff had four prior psychiatric hospitalizations for depression in her 20s. (R. 112). Upon examination, Plaintiff denied hallucinations and denied suicidal or homicidal ideations. (R. 112). Dr. Ramos found that Plaintiff's mood was depressed and her affect was constricted. Dr. Ramos' axis I diagnosis was major depressive disorder, axis II diagnosis was deferred, axis III diagnosis was obesity, axis IV diagnosis was problems with

---

[2] A GAF score of 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) (DSM-IV).

7

primary support group, and axis V assessed a GAF of 60/ 70.[3]  Dr. Ramos prescribed Effexor and Ativan and recommended continued counseling.

Steven R. Kramm, D.O., was Plaintiff's primary care physician.  (R. 117-128).  On January 7, 2003, Plaintiff reported that she was taking Effexor and feels well.  (R. 121).  She reported that she is not sleepy during the day and she sleeps well at night and has had no crying spells.  (R. 121).  Dr. Kramm's notes indicated that Plaintiff's anxiety depression is controlled on Effexor.  (R. 121).  Dr. Kramm's April 7, 2003 note also indicated that Plaintiff tolerated Effexor well.  In September 2003, Plaintiff reported to Dr. Kramm that she was stressed at work.  He recommended that she switch departments at work.  A physical examination on September 25, 2003 revealed a soft, obese abdomen, tender in the upper right side, and no peripheral edema in the lower extremities.  (R. 120).  Dr. Kramm also referred her to a weight loss clinic.  (R. 118, 121).  On October 3, 2003, Plaintiff requested an excuse to be off work due to abdominal pain.  (R. 120).

In January 2004, Plaintiff reported to Dr. Kramm that she was not sleeping well. Plaintiff requested a refill of Effexor.  (R. 119).  Dr. Kramm prescribed Effexor as well as Ativan.  On May 4, 2004, Plaintiff complained of swelling in her legs and feet, greater on the left side.  (R. 117).  She reported that it has not gotten worse, but is persistent and causes significant discomfort as well as inability to wear shoes on some days.  Upon examination, Dr. Kramm noted bilateral lower extremity edema, no increased redness and no calf muscle tenderness.  (R. 117).  Dr. Kramm prescribed Lasix and recommended a follow-up visit.  On May 10, 2004, Plaintiff complained of pain in her calf.  (R. 117).  On May 19, 2004, Dr. Kramm gave Plaintiff a supply of Effexor.  (R. 117).

---

[3]  A GAF score of 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers); a GAF score of 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM-IV at 34.

In August 2004, Mohammed A. Samad, M.D., examined Plaintiff and completed a Medical Source Statement of Plaintiff's Ability to Perform Work-Related Physical Activities. (R. 129-136). He found that Plaintiff could occasionally lift and carry twenty-five pounds; stand and walk one hour or less in an eight-hour day; had no limitations with sitting; was limited in pushing and pulling with her lower extremities, specifically her left leg; could never kneel, crouch or climb; and should not be around heights or moving machinery. (R. 132-33). Dr. Samad also noted that there was a fear of self-injury. (R. 133).

Plaintiff reported to Dr. Samad that the pain in her left leg is usually an eight on a scale of one to ten. (R. 129). She reported that she cannot walk one block, cannot go up a flight of stairs, cannot lift twenty-five pounds, has swelling of the ankles, she cries often and was previously diagnosed as bipolar manic-depressive. (R. 129-30). Dr. Samad noted that Plaintiff had superficial varicosities of the left lower extremity and +2 pitting edema. He ultimately concluded "[t]here was really no limitation of movements of any of the joints except for obesity." (R. 130). Dr. Samad believes that Plaintiff's pain in her left leg stems from degenerative osteoarthritis. (R. 130). Plaintiff stated that she takes Effexor and Lasix. (R. 130).

A Disability Determination Service (DDS) physician completed a Residual Functional Capacity (RFC) Assessment on August 31, 2004. (R. 137-144). The DDS physician's primary diagnosis was osteoarthritis, the secondary diagnosis was obesity with a body mass index (BMI) of 55. (R. 137). The doctor found that Plaintiff could occasionally lift and/ or carry twenty pounds; frequently lift and/ or carry ten pounds; stand and/ or walk and sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/ or pull unlimitedly; could frequently climb a ramp/ stairs or ladder/ rope/ scaffold; she could frequently balance, kneel, crouch and crawl; and occasionally stoop. (R. 139). The doctor found no manipulative limitations, no visual limitations, no communicative limitations and no environmental limitations. (R. 140-41). The doctor lastly noted that Plaintiff rests during cooking, cleaning and shopping. (R. 142). After reviewing all of the medical and non-medical evidence, the doctor ultimately found the Plaintiff only partially credible. (R. 142).

The doctor completed the RFC Assessment with a statement from a treating or examining source regarding Plaintiff's physical capacities, and he noted that his conclusions were not significantly different from the treating/examining source's conclusions.  (R. 143).

Joseph A. Barrett, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records in September 2004.  (R. 145–58).  Dr. Barrett completed a Psychiatric Review Technique Form and concluded that Plaintiff's impairments were not severe and there were coexisting non-mental impairments that required referral to another medical speciality.  (R. 145).

Dr. Barrett evaluated Plaintiff's condition under the requirements of Listing 12.04 (Affective Disorders).  The Supreme Court has held that a claimant must prove that her condition meets every criteria in a listing before she can be considered disabled *per se*. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is disabled *per se* under Listing 12.04 when she either satisfies the requirements of both 12.04(A) and 12.04(B), or of 12.04(c).  Dr. Barrett found disturbance of mood, accompanied by a full or partial manic or depressive syndrome, but found that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria" of Listing 12.04(A).  (R. 148).  Plaintiff presented no medical evidence to counter Dr. Barrett's findings.

Listing 12.04(B) requires that the symptoms described in (A) result in at least two of the following:

      1. Marked restriction of activities of daily living;

      2. Marked difficulties in maintaining social functioning;

      3. Marked difficulties in concentration, persistence, or pace; or

      4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04.  Dr. Barrett found there were mild restrictions of activities of daily living; mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. 155).

The Plaintiff does not point to anything in the record contending that she meets the requirements of Listing 12.04(C), which are:

> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04(C).  Dr. Barrett specifically found that the Plaintiff's mental impairments were not severe and did not meet Listing 12.04 (C).  (R. 156). The Plaintiff offered no expert medical opinion to counter Dr. Barrett's findings.  We find that there is substantial evidence to support the ALJ's conclusion that the Plaintiff has not met the requirements for Listing 12.04 Affective Disorders.

We must stress that it is the claimant's burden to prove that her condition meets or equals the specific clinical requirements of a listed impairment, such as Listing 12.04, before she can be considered to be disabled *per se* without consideration of vocational factors, such as age, education, and work experience.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Brown*, 845 F.2d at 1213.  To be entitled to disability benefits, a claimant must show that all, not just some, of the criteria for a listing are met.  *Zebley*, 493 U.S. at 530.  The Commissioner must make the legal determination as to whether an impairment meets or equals a listing.  *See* 20 C.F.R. § 404.1527(e)(1) and (2).

Although the ALJ's decision did not go step-by-step through the requirements of Listing 12.04, substantial evidence supports the ALJ's finding that the Plaintiff was not suffering from depression at any time through the date of the ALJ's decision.  (R. 21).

On December 13, 2004, Dr. Kramm completed a Health-Sustaining Medication Assessment Form for the Department of Public Welfare and concluded that Plaintiff was temporarily disabled for twelve months or more.  He opined that her disability began on June 9, 2004 and was expected to last until June 9, 2005.  (R. 159-60).  Dr. Kramm's primary diagnosis was morbid obesity and his secondary diagnosis was depression.  (R. 159).

On June 20, 2005, Dr. Kramm completed another Employability Assessment Form and concluded that Plaintiff was temporarily disabled for a period of twelve months or more. He opined that Plaintiff's disability began on June 29, 2004 and was expected to last until June 29, 2006.  (R. 162).  Dr. Kramm's primary diagnosis was morbid obesity and his secondary diagnosis was depression and severe degenerative joint disease in both knees causing an inability to exercise and lose weight.  (R. 162).

Plaintiff continued to treat with Dr. Kramm through October 2005.  (R. 174-185).  An x-ray of Plaintiff's hips and knees in August 2005 revealed negative left hip, except for mild joint space narrowing, and negative right hip, except for mild joint space narrowing.  (R. 183).  The x-ray of the right knee revealed further advanced degenerative changes at the medial compartment of the knee with cartilage thinning and degenerative changes at the patellofemoral joint with cartilage thinning suggestive of chondromalacia, and no fracture. The x-ray of the left knee revealed advanced degenerative changes at the knee joint, more localized to the medial compartment, with loss of cartilage, no loss of cartilage in the patellofemoral joint consistent with chondromalacia.  (R. 183).  Dr. Kramm informed Plaintiff of the degenerative changes of both knees.  (R. 176).  His plan was "to make every effort to begin a weight loss program."  (R. 176).

In December 2004, Plaintiff requested a referral to Christopher Motto, M.D., for gastric bypass surgery.  (R. 179).  In May 2005, Plaintiff complained to Dr. Kramm of severe left leg pain.  Dr. Kramm noted that she had a deformed leg appearance due to her obesity. (R. 177).  He noted tenderness along the lateral aspect of the leg and venous varicosities. Dr. Kramm also noted that the leg was not warm, red and not significantly swollen.  (R. 177). Dr. Kramm ordered an x-ray and gave her Ultram.

12

In August 2005, Plaintiff complained to Dr. Kramm of pain in her right heel and lumps on her lower leg and foot. (R. 175). Dr. Kramm noted fatty lipoma in the right lower leg and Achilles tendinitis. (R. 175). He injected Plaintiff's heel and recommended a follow-up visit. Plaintiff again complained of right heel pain and left knee pain in October 2005. (R. 175). Dr. Kramm again injected her heel and considered injecting the left knee if the pain continued. (R. 175).

Plaintiff was seen by Dr. Motto in June 2005 for an evaluation regarding her obesity. (R. 167). Dr. Motto referred Plaintiff for a psychosocial evaluation and recommended motivational counseling and a life coach. He noted that Plaintiff has degenerative joint disease (DJD) of both knees and weight loss would help alleviate the DJD.

In July 2006, Plaintiff was seen by Dr. Motto and he noted a five pound weight loss in two weeks. (R. 196). He noted that Plaintiff should increase her physical activity and continue to lose the required 10% weight loss before undergoing bypass surgery. (R. 196).

Marie L. Moerkbak, MA, treated Plaintiff in August 2005 at Dr. Motto's weight loss clinic. (R. 168). Ms. Moerkbak found "there are no psychological contraindications" to Plaintiff proceeding with gastric bypass surgery. (R. 168). Plaintiff reported that she previously worked at Wal-Mart but had to stop working due to knee pain from her weight. (R. 169). Plaintiff reported that she was dieting and exercising in an attempt to lose weight. (R. 169). Her weight loss goal was forty-four pounds. Ms. Moerkbak indicated that there were no prescription medications on file for Plaintiff, however she noted that Plaintiff takes Effexor for depression. (R. 170-71). Ms. Moerkbak found that Plaintiff's mood was depressed, she had difficulty initiating and maintaining sleep, had an extreme sense of worthlessness, improved interest and energy, good concentration, poor appetite, unremarkable psychomotor agitation/ retardation, and no suicidal ideation or intent. (R. 171). Ms. Moerkbak diagnosed Plaintiff with an eating disorder, not otherwise specified,

and assessed a GAF of 51-60.[4]

In December 2005, Plaintiff treated with Thomas L. Martin, M.D., an orthopedic specialist. (R. 195). Plaintiff reported pain in her knees, greater in the left. (R. 195). Dr. Martin reviewed the November 11, 2005 MRI of Plaintiff's left knee. He noted that it showed very severe tricompartmental degenerative change, very large osteophytes, patellofemoral, medial and lateral compartments and no fractures. (R. 195). Dr. Martin prescribed Feldene. He noted that even if Plaintiff loses weight, "her knee is really bad and some day she will need a knee replacement. Hopefully we can get her many years down the road." (R. 195).

## V. DISCUSSION.

The Plaintiff alleges that the ALJ erred in the following ways: (1) failing to find that Plaintiff's sleep apnea was a "severe" impairment, and consequently failing to consider it in formulating Plaintiff's RFC; (2) failing to find the Plaintiff's condition met or equaled the requirements of Listing 1.02, and not properly considering the application of that regulation to Plaintiff's claim; (3) improperly rejecting the opinion of Plaintiff's treating physician; and (4) setting forth an improper credibility evaluation that was not supported by substantial evidence. (Doc. 10 at 3).

### A. Whether the ALJ erred in failing to find that Plaintiff's sleep apnea was a "severe" impairment, and consequently failing to consider it in formulating Plaintiff's RFC.

The ALJ found that Plaintiff suffered from severe impairments of advanced degenerative changes of both knees with chondromalacia, and morbid obesity. (R. 20). The ALJ also found that Plaintiff's depression and sleep apnea are not severe impairments. (R. 20-21). Plaintiff argues that the ALJ erred in finding her sleep apnea "non-severe." (Doc. 10 at 4; Doc. 14 at 2-3). Plaintiff argues that an impairment is "non-severe" only "if it does not

[4] As stated *supra*, a GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34.

significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. Plaintiff further argues that the Commissioner has interpreted this to mean that a non-severe impairment is a "slight abnormality" or a combination of slight abnormalities that causes "no more than minimal limitation" in ability to function. SSR 85-25. Thus, Plaintiff alleges, an impairment may be dismissed as non-severe only if it is minimal or slight. (Doc. 10 at 5). Plaintiff argues that the ALJ erred by failing to apply the *de minimis* standard and failing to note that Plaintiff underwent a sleep study.

Defendant counters that the case law cited by Plaintiff is not dispositive of the present issue because the cited case law denied the claim at step two. Here, the ALJ continued through the sequential evaluation process and concluded that the Plaintiff was not disabled. (Doc. 11 at 12-13). Defendant also argues that the sleep study merely showed that Plaintiff snored loud and had restless sleep, with no indication of daytime hypersomnolence.[5] Additionally, Defendant argues that Plaintiff never complained of daytime hypersomnolence and the record is inconsistent with Plaintiff's complaints of hypersomnolence. Defendant also asserts that "[w]hether or not an ALJ identified a particular medical impairment as severe, he is still required to consider the effects of all impairments, in the remaining steps of the sequential evaluation process." (Doc. 17 at 4, n. 3) (citing 20 C.F.R. §§ 404.1523, 416.923 (2006)). Thus, the designation of an impairment as severe or non-severe is not dispositive to the outcome of the case, so long as the sequential evaluation process does not end at step two.

In the instant case, the ALJ found that Plaintiff suffered from the severe impairments of advanced degenerative changes of both knees with chondromalacia, and morbid obesity. The ALJ found that Plaintiff's depression and sleep apnea were non-severe and he proceeded through the sequential evaluation process. At step four, the ALJ found that Plaintiff was capable of performing her past relevant work. Thus, review need not proceed

---

[5] We note that the Plaintiff's sleep apnea study on November 1, 2005 did in fact indicate "excessive daytime hypersomnolence." (R. 186).

15

any further.  The ALJ specifically noted that he "considered *all* symptoms" when making his finding and noted that she has sleep apnea, does not sleep well and falls asleep during the day.  (R. 21) (emphasis added).

As stated, Plaintiff testified that she falls asleep about six or seven times per day for fifteen to thirty minutes.  (R. 223-24).  Plaintiff's sleep apnea study in November 2005 revealed that she stopped breathing fifty-five times in one hour.  However, Plaintiff reported that since she began wearing a breathing mask while sleeping she is down to seven episodes. (R. 223).  The sleep apnea study revealed that Plaintiff snores moderate to loud and she experienced respiratory events while on her right side.  The test revealed leg movement, thought to be a knee jerk reaction to obstructive respiration and snoring.  (R. 186).  The test also indicated loud snoring, and restless sleep with excessive daytime hypersomnolence.  (R. 186).  However, in January 2003 Plaintiff reported to Dr. Kramm that she was "sleeping well."  (R. 121).  Additionally, as Defendant argues, Plaintiff did not seek any sleep testing until November 2005, over a year after her alleged disability onset date.  (Doc. 11 at 14; Doc. 17 at 5).

We find that the ALJ properly considered all of Plaintiff's impairments, severe and non-severe, and properly determined the Plaintiff's RFC.  Residual functional capacity is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Comm. of SSA*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted).  In this case, the ALJ determined that, despite her severe impairments, the Plaintiff did have the RFC to perform light work.  (R. 21).

The Court in *Burnett*, 220 F.3d at 121, stated that the ALJ must consider all evidence before him in making a RFC determination.  The *Burnett* Court further stated that, while the ALJ is permitted to weigh the credibility of the evidence, he is required to give some indication of the evidence which he rejects, as well as the reasons for discounting the evidence.  *Id*.  Thus, the ALJ must mention and refute some of the contradictory medical evidence before him.  *Id*.  *See also Adorn v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).  The ALJ also must give the Plaintiff's subjective complaints "serious consideration," *Mason*, 994 F.2d

at 1067, and make specific findings of fact, including credibility, as to Plaintiff's residual functional capacity. *Burnett*, 220 F.3d at 120. We find that, in the instant case, the ALJ considered all of the medical evidence before him, and he mentioned and refuted some of the contradictory evidence, such as Dr. Kramm's opinion that Plaintiff was disabled. (R. 16-17).

> **B. Whether the ALJ erred in failing to find that the Plaintiff's condition met or equaled the requirements of Listing 1.02, and not properly considering the application of that regulation to Plaintiff's claim.**

Plaintiff argues that the ALJ's failure to explain his reasoning and discuss the evidence relied upon shows that his finding that Listing 1.02 was not met was unsupported by substantial evidence, and thus was an error. (Doc. 10 at 8-9). Plaintiff argues that the medical evidence supports a finding of gross anatomical deformity within the meaning of Listing 1.02. Additionally, Plaintiff asserts that she cannot ambulate effectively due to her impairments. (Doc. 10 at 9). Plaintiff states that the fact that she does not use a cane is not dispositive. Plaintiff argues that even if her condition does not meet the requirements of Listing 1.02, the evidence reveals that her condition is medically equivalent to the requirements of 1.02.

Defendant counters that Plaintiff's argument is a misrepresentation of the ALJ's step three finding. (Doc. 11 at 15). Defendant asserts that the ALJ did not base his finding only on Plaintiff's failure to use a cane, rather it was an example of one factor of the listing that was not met. Next, Defendant asserts that Plaintiff did not show any difficulty ambulating. Even if Plaintiff had shown difficulty ambulating, an impairment that manifests only some of the criteria of a listing does not qualify. (Doc. 11 at 15). *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Defendant notes that Listing 1.02 requires an "extreme limitation" in the ability to ambulate as defined in 1.00B2b, and the Plaintiff did not demonstrate such limitation.

Listing 1.02 provides as follows:

*Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal

motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02 (2004). The Plaintiff has the burden of proving that she meets each of the requirements of a Listing. *See Sullivan*, 493 U.S. at 530. We find that there is substantial evidence to support the ALJ's decision that the Plaintiff's condition did not meet or equal Listing 1.02.

The ALJ acknowledged that Plaintiff has problems walking, climbing stairs, and is in constant pain. (R. 21). However, the ALJ also noted that Plaintiff stated she can walk twenty-five steps, sit for five to seven minutes, stand for five to ten minutes, and lift twenty-five to fifty pounds. Plaintiff lives alone and cares for herself. She cooks small foods, cleans, and does laundry. The ALJ noted that Plaintiff does not use a cane, is able to ambulate effectively and her pain medication is Advil or Tylenol. (R. 21). The ALJ also noted that he considered Plaintiff's obesity in this determination. (R. 21). Listing 1.02 requires in part chronic joint pain with signs of limitation of motion with involvement of a major peripheral weight-bearing joint, resulting in inability to ambulate effectively. As discussed by the ALJ, the examinations of Plaintiff's treating physician did not indicate that the Plaintiff met or equaled any of the musculoskeletal listings. (R. 21). Nor is there any other evidence in the record which demonstrates that Plaintiff met Listing 1.02.

Dr. Samad examined Plaintiff in August 2004 and ultimately concluded "[t]here was really no limitation of movements of any of the joints except for obesity." (R. 130). Similarly, the DDS physician concluded that Plaintiff was not entirely credible and could occasionally lift and/ or carry twenty pounds; frequently lift and/ or carry ten pounds; stand and/ or walk and sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/ or pull unlimitedly; could frequently climb a ramp/ stairs or ladder/ rope/ scaffold; she could frequently balance, kneel, crouch and crawl; and occasionally

18

stoop.  (R. 138-39).  Plaintiff herself testified that she could lift twenty-five to fifty pounds.

(R. 220).  Plaintiff also testified that she could work an eight-hour day that permitted her to

sit or stand whenever she wanted, though with pain.  (R. 221).  Based on the foregoing, we

find that the ALJ did not err in failing to find that the Plaintiff's condition met or equaled the

requirements of Listing 1.02.

### C. Whether the ALJ erred in improperly rejecting the opinion of Plaintiff's treating physician.

The Plaintiff argues that the ALJ erred in not giving controlling weight to the opinion

of treating physician Dr. Kramm.  (Doc. 10 at 12).  The Third Circuit set forth the standard

for evaluating the opinion of a treating physician in the case of *Morales v. Apfel*, 225 F.3d

310  (3d Cir. 2000).  The Court stated:

> A cardinal principle guiding disability eligibility determinations is that
> the ALJ accord treating physicians' reports great weight, especially
> "when their opinions reflect expert judgment based on a continuing
> observation of the patient's condition over a prolonged period of time."
> *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco
> v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987); *see also Adorno v.
> Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v.
> Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861
> F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585.  Where, as
> here, the opinion of a treating physician conflicts with that of a non-
> treating, non-examining physician, the ALJ may choose whom to credit
> but "cannot reject evidence for no reason or for the wrong reason."
> *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058,
> 1066 (3d Cir.1993)).  The ALJ must consider the medical findings that
> support a treating physician's opinion that the claimant is disabled. *See
> Adorno*, 40 F.3d at 48.  In choosing to reject the treating physician's
> assessment, an ALJ may not make "speculative inferences from medical
> reports" and may reject "a treating physician's opinion outright only on
> the basis of contradictory medical evidence" and not due to his or her
> own credibility judgments, speculation or lay opinion.  *Plummer*, 186
> F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988);
> *Kent*, 710 F.2d at 115.

*Id*. at 317-18.

The ALJ is required to evaluate every medical opinion received.  20 C.F.R. §

404.1527(d).  Although he must consider all medical opinions, the better an explanation a

source provides for an opinion, particularly through medical signs and laboratory findings,

the more weight [the ALJ] will give that opinion.  20 C.F.R. § 404.1527(d)(3).  While treating physicians' opinions may be given more weight, there must be relevant evidence to support the opinion.  20 C.F.R. § 404.1527(d).  Automatic adoption of the opinion of the treating physician is not required.  *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

Here, the Plaintiff argues that the ALJ erred when he rejected Dr. Kramm's opinion. Dr. Kramm found that Plaintiff was disabled due to her morbid obesity and degenerative joint disease of the knees, and he referred her for gastric bypass surgery.  The ALJ rejected Dr. Kramm's opinion stating that his "treatment notes and statements do not provide support for this assertion."  (R. 22).  Plaintiff argues that Dr. Kramm's treatment records, as well as the records of other physicians provide evidence of disabling conditions and that the ALJ therefore rejected Dr. Kramm's opinion for the wrong reasons.  (Doc. 10 at 12).

Defendant counters that the ALJ did not reject Dr. Kramm's opinion for the wrong reason.  (Doc. 11 at 17).  Defendant notes that the ALJ correctly stated that Dr. Kramm found only a "temporary" disability.  Defendant asserts that the ALJ correctly rejected Dr. Kramm's "check-box" statement of disability.  We note that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason*, 994 F.2d at 1065.  Defendant ultimately argues that substantial evidence supports the ALJ's conclusion that Dr. Kramm's treatment notes and statements did not provide support for his assertion of disability.  (Doc. 11 at 18).

The ALJ found that the Plaintiff is morbidly obese and has degenerative changes in her knees.  However, the ALJ noted that Plaintiff is not on any significant pain medication, she only takes over-the-counter medication.  Plaintiff handles her activities of daily living. (R. 22).  The ALJ also noted that despite Plaintiff's allegations of depression, she passed the psychological evaluation for gastric bypass surgery.  Overall, the ALJ found that the medical records do not support a finding of disability.  (R. 22).

Additionally, the vocational expert testified that the Plaintiff could perform her past relevant work as well as other jobs that exist in sufficient numbers which an individual similar to Plaintiff could perform.  That testimony, coupled with all the other evidence of

record, constitutes substantial evidence to support the ALJ's decision that the Plaintiff was not disabled. *See Chrupcala v. Heckler*, 829 F.2d 1269 (3d Cir. 1987). We therefore find that the ALJ did not err in not giving controlling weight to the opinion of treating physician Dr. Kramm.

### D. Whether the ALJ erred in setting forth an improper credibility evaluation that was not supported by substantial evidence.

Plaintiff argues that the ALJ failed to follow the applicable rules and regulations when he assessed Plaintiff's credibility. (Doc. 10 at 13). Defendant counters that the record as a whole supports the ALJ's conclusion that Plaintiff's allegations of disabling limitations of function were not entirely credible. (Doc. 11 at 19). Defendant argues that Plaintiff's allegations were not consistent with her past medical history, the current medical evidence, or with her own statements. Defendant asserts that Plaintiff never complained of disabling limitations or treatment for obesity/ knee problems prior to her firing, and there was only "sparse conservative treatment through the date of the decision." (Doc. 11 at 19). Defendant also asserts that Plaintiff did not stop working due to her impairments, rather she was fired. Plaintiff admitted that she was told to apply for benefits by the welfare agency because she could not afford her anti-depressant medication. (R. 83-84).

An ALJ must give weight to a claimant's subjective testimony of her inability to perform even light or sedentary work, but only when the claimant's testimony is supported by competent medical evidence. *Schaudeck v. Commissioner of Social Security*, 181 F. 3d 429, 433 (3d Cir. 1999). The ALJ found that the medical evidence, including the reports of Plaintiff's treating doctors, the objective medical tests, and Plaintiff's testimony, reveals that the Plaintiff had impairments that could cause symptoms, but not to the extent Plaintiff alleged. (R. 21-22). Thus, the ALJ found that the Plaintiff was not fully credible regarding the severity of the symptoms she claimed. The record, as detailed above, substantiates this finding.

Under the regulations, subjective complaints of pain are to be carefully considered. Social Security Ruling 88-13. The ALJ properly considered Plaintiff's subjective complaints,

in accordance with 20 C.F.R. § 416.929 (1998), in assessing residual functional capacity. Social Security Regulations provide a two-step process for evaluating a claimant's subjective complaints, including pain.  20 C.F.R. § 416.929 (1998).  An ALJ must first determine whether there is objective medical evidence of an impairment resulting from anatomical, physiological, or psychological abnormalities that could reasonably be expected to cause the pain or other symptoms alleged.  20 C.F.R. § 416.929(b).  Objective evidence consists of medical signs and laboratory findings.  *Id.  See also Taybron v. Harris*, 667 F.2d 412, 415, n. 6 (3d Cir. 1981).  Other evidence consists of statements from the Plaintiff, treating and examining physicians' reports, daily activities, efforts to work, and any other evidence that demonstrates the Plaintiff's impairments and any related symptoms that affect the Plaintiff's ability to work.  *Id*.  If such an impairment exists, the ALJ must consider the intensity and persistence of a claimant's symptoms and their effect on her ability to perform work.  20 C.F.R. § 416.929(c).

        The ALJ found that, based on the objective medical evidence, there was no support for Plaintiff's allegations of disabling pain and limitations.  (R. 21).  The ALJ found that the Plaintiff's impairments could produce the alleged symptoms, however not to the intensity, duration and limiting effects the Plaintiff alleged.  (R. 21).  Thus, we find no error in the ALJ's consideration of Plaintiff's credibility and subjective complaints of pain.  *See Casias v. HHS*, 933 F. 2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility").

 **VI.  RECOMMENDATION.**

        Based on the foregoing, it is respectfully recommended that the Plaintiff's appeal be **DENIED**.



                                        **s/ Thomas M. Blewitt**
                                        **THOMAS M. BLEWITT**
                                        **United States Magistrate Judge**


**Dated: August 3, 2007**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CYNTHIA A. MORRIS, | : | CIVIL ACTION NO. **4:CV-06-1720** |
| | : | |
| Plaintiff | : | (Judge McClure) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **August 3, 2007.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within ten (10)
> days after being served with a copy thereof.  Such party shall file
> with the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections.  The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge shall
> make a *de novo* determination of those portions of the report or
> specified proposed findings or recommendations to which objection
> is made and may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge.  The judge, however,
> need conduct a new hearing only in his or her discretion or where
> required by law, and may consider the record developed before the
> magistrate judge, making his or her own determination on the basis
> of that record.  The judge may also receive further evidence, recall
> witnesses or recommit the matter to the magistrate judge with
> instructions.

s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: August 3, 2007**